UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Alexandra Drake,
     Plaintiff

     v.                              Case No. 16-cv-470-SM
                                      Opinion No. 2017 DNH 103

Town of New Boston, et al.,
     Defendants

# O R D E R

Plaintiff, Alexandra Drake, worked as a police officer for the Town of New Boston Police Department from June 1, 2013, until June 9, 2015, when she was placed on administrative leave. On December 8, 2015, the New Boston Board of Selectmen terminated her employment. Drake subsequently filed a multicount complaint against the Town of New Boston, New Hampshire (the "Town" or "New Boston"); James Brace, in his official capacity as New Boston's Chief of Police and in his individual capacity; New Boston Board of Selectmen members Dwight Lovejoy, Christine Quirk and Joseph Constance, in their individual and official capacities; New Boston Police Lieutenant Michael Masella, in his individual and official capacities; and Gary Fisher, Chief Deputy Sheriff of the Hillsborough County Sheriff's Department, in his individual and official capacities.

New Boston, Brace, Lovejoy, Quirk and Constance

(collectively, the "Town Defendants") have moved to dismiss

several of Drake's claims against them.  The motion is denied in

part, and granted in part.

## STANDARD OF REVIEW

When ruling on a motion to dismiss under Fed. R. Civ. P.

12(b)(6), the court must "accept as true all well-pleaded facts

set out in the complaint and indulge all reasonable inferences

in favor of the pleader."  SEC v. Tambone, 597 F.3d 436, 441

(1st Cir. 2010).  Although the complaint need only contain "a

short and plain statement of the claim showing that the pleader

is entitled to relief," Fed. R. Civ. P. 8(a)(2), it must allege

each of the essential elements of a viable cause of action and

"contain sufficient factual matter, accepted as true, to state a

claim to relief that is plausible on its face," Ashcroft v.

Iqbal, 556 U.S. 662, 678 (2009) (citation and internal

punctuation omitted).


In other words, "a plaintiff's obligation to provide the

'grounds' of his 'entitlement to relief' requires more than

labels and conclusions, and a formulaic recitation of the

elements of a cause of action will not do." Bell Atl. Corp. v.

Twombly, 550 U.S. 544, 555 (2007).  Instead, the facts alleged

in the complaint must, if credited as true, be sufficient to "nudge[] [plaintiff's] claims across the line from conceivable to plausible." Id. at 570. If, however, the "factual allegations in the complaint are too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture, the complaint is open to dismissal." Tambone, 597 F.3d at 442.

"Under Rule 12(b)(6), the district court may properly consider only facts and documents that are part of or incorporated into the complaint; if matters outside the pleadings are considered, the motion must be decided under the more stringent standards applicable to a Rule 56 motion for summary judgment." Trans-Spec Truck Serv., Inc. v. Caterpillar Inc., 524 F.3d 315, 321 (1st Cir. 2008) (citing Garita Hotel Ltd. Partnership v. Ponce Fed. Bank, F.S.B., 958 F.2d 15, 18 (1st Cir. 1992)). "When ... a complaint's factual allegations are expressly linked to — and admittedly dependent upon — a document (the authenticity of which is not challenged), that document effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6)." Id. (quoting Beddall v. State St. Bank & Trust Co., 137 F.3d 12, 16-17 (1st Cir. 1998) (additional citations omitted).

Accepting the factual allegations in the amended complaint as true, the relevant background follows.  On June 1, 2013, Alexandra Drake was hired as a part-time police officer for the New Boston Police Department; in December 2013, she was hired to work full-time.[1]  Officer Masella interviewed Drake as part of the hiring process, recommending to Chief Brace that Drake be hired.  Masella was ultimately assigned as Drake's Field Training Officer.

Masella was a highly experienced officer, with several years of experience.  Before joining the New Boston Police Department, Masella worked for 23 years as an officer with the Nashua Police Department, retiring as a Patrol Sergeant.  Before that he served in the United States Marine Corps.  During Masella's time with the NBPD, he was quickly promoted to Sergeant, and then Lieutenant.  Chief Brace and Masella were close friends; their families vacationed together.

As Drake's Field Training Officer, Masella was tasked with supervising and training Drake in a wide variety of areas

---

[1]    Beginning in May of 2013, Drake attended the New Hampshire Police Standards and Training Counsel's part-time academy, graduating on August 22, 2013.  Beginning in May of 2014, Drake attended the New Hampshire Police Standards and Training Counsel's full-time academy, graduating on August 22, 2014.

including the law applicable to arrests, and searches and seizures; conducting accident investigations, criminal investigations, and motor vehicle stops; report writing; professional demeanor; town policy and prohibited conduct by a police officer; as well as the Standard Operating Procedures of the New Boston Police Department.  Masella was also tasked with evaluating Drake's performance.  For her part, Drake was "intimidated" by Masella's extensive training and years of service, especially since Masella "made it abundantly clear to [her] that he was not one to confront."  Compl. ¶ 31.

Soon after she began working with Masella, Drake noticed Masella was engaging in inappropriate behavior.  For example, while field training Drake, Masella conducted traffic stops of female drivers.  After completing one such stop, Masella told Drake that, rather than issue a citation, he wanted to take the female driver out and "rape" them.  Masella also made comments to Drake about female drivers that he believed found him attractive, and developed what he called a "rapability" scale.  After a traffic stop, Masella would test Drake on whether a particular female driver was "rapable."  Compl. ¶ 36.

Masella also made inappropriate comments about New Boston Police Department Officers Jennifer Watson and Kate Bragg, both of whom were Drake's senior officers.  Masella complained to

Drake that Watson "cried all the time," and that Bragg was "full of 'drama.'"  Compl. ¶¶ 33-34.  Masella's comments about Watson and Bragg made Drake "self-conscious as to how Masella would view her," Compl. ¶ 33, and "convinced [her that] she did not want to get on Masella's bad side," as she was "certain . . . the slightest slip could make her a target of severe harassment, termination of employment or even rape."  Compl. ¶ 37.

In September of 2014, Drake brought a report concerning a DWI arrest she had conducted to Masella for review.  Drake's report was an internal document, not to be released outside the police department without Masella's or Chief Brace's approval. After reviewing the report, Masella ordered Drake to add certain information into the report "for the benefit of the defense attorneys."  Compl. ¶ 57.  Masella had requested that Drake make similar corrections in the past; however, this time his requested modification was not factually correct.  Nonetheless, Drake complied with Masella's order and modified the report.

In November of 2014, Drake and two other New Boston officers stopped a U-Haul truck driver for erratic operation. The driver, who was placed in protective custody, was carrying a large amount of cash.  Drake was charged with counting that cash on video camera at the New Boston Police Station for documentation purposes.  Masella ordered Drake to write the

police report for all three officers present at the scene, which was contrary to the police department's standard practice (which required each police officer to write his or her own report). Speaking with Drake later about the stop, Masella asked Drake whether she had included in her report that she had counted the cash on video camera. When Drake indicated that she had not yet completed her written report, and still needed to include the documentation of the cash, Masella "lashed out" at Drake, calling her a "liar." Compl. ¶ 44.

Drake was generally reluctant to report Masella's conduct because of Masella's status within the NBPD, and his close friendship with Chief Brace. After Masella was promoted to Sergeant, he made comments to Drake concerning Officer Watson, making clear his dislike of Watson, suggesting that Watson would be terminated. Shortly after Masella made those comments, Watson was summarily terminated by the NBPD.

Nonetheless, after the November 2014 U-Haul incident, Drake, upset that Masella had called her a "liar," reported the incident to Chief Brace. She explained to Brace that she was distressed that Masella had questioned her integrity. Chief Brace told Drake that she needed to follow the chain of command, and raise her concerns directly with Masella. At that point, "Drake realized it would be futile to take any matters to

[Chief] Brace regarding Masella's conduct;" and, she was afraid to raise her concerns directly with Masella because of Masella's treatment of employees he did not like (like Watson).  Compl. ¶ 45.

Shortly after the November 2014 U-Haul incident, Drake spoke with Kathleen MacDonald, a records clerk for the NBPD, regarding her concerns about Masella.  MacDonald told Drake that "it was known" that Masella made inappropriate sexual comments towards Drake, other members of the NBPD, and female motorists. However, MacDonald warned, if Drake complained to Masella or Chief Brace about those comments, Masella and Chief Brace would make Drake's life a "living hell."  Compl. ¶ 46.

Masella's inappropriate conduct continued.  In December of 2014, Drake, off duty, ran into Masella at a local bank.  Drake was wearing a pair of sweatpants with "Pink" imprinted on the rear.  Masella questioned Drake's choice of attire, asking her "Pink . . . are you trying to get the guys to look at your *ss," making clear to Drake that he was looking at her buttocks. Compl. ¶ 48.  He then told Drake he had a similar pair of sweatpants, but his read "Juicy."

Masella's "on duty" conduct was no better.  While Drake was present, Masella spoke negatively about other NBPD officers

(including Drake's immediate supervisor Sergeant Richard
Widener) to a member of another law enforcement agency, telling
Drake to "keep her f*cking mouth shut." Compl. ¶ 47. He yelled
out "f*cking women" while working with Drake, but assured Drake
that she "did not count." Compl. ¶ 49. Masella also told Drake
that there were two groups of officers working at the NBPD, and
that the second group of officers, including Officer Watson,
would not be working there much longer (because Masella did not
want them working there). (As mentioned above, Officer Watson
was terminated by the NBPD; the other officer whose name was
included in Masella's second group resigned.)

After Watson's termination, Masella (and Chief Brace) asked
Drake to lie to Watson to obtain information about a case Watson
had been handling prior to her termination. Brace and Masella
instructed Drake to falsely tell Watson that Drake was working
on a particular case.

Finally, on multiple occasions, Masella invited Drake to
his home in Florida for the weekend (but did not invite other
NBPD officers to his Florida residence).

In February of 2015, Drake spoke with patrolman Daniel
Aiken about Masella. Aiken stated that they both had a duty to
report Masella's misconduct, and so together they reported

Masella's behavior to Sergeant Widener. Sergeant Widener "was already aware of the complaint," and told Aiken and Drake he would take care of it. At that time, Drake also told Widener that Masella had ordered her to falsify a police report in September 2014. Widener told Drake he "was disgusted," and would handle the matter. However, Widener did not report Masella's misconduct at that time.

A month later, in March of 2015, Masella, on duty in uniform and driving a police cruiser, came to Drake's home, uninvited, while she was off duty. When Drake, who lived alone, opened the door, Masella asked if she was naked. When Drake responded that she was not, Masella joked he would come back later. He then let himself into Drake's house, and began to discuss his new car.

In April of 2015, Drake applied for a police officer position with the Manchester, New Hampshire, Police Department. She excelled in the application process, which included a polygraph test. During the pre-polygraph interview, Drake told the examiner that, in September of 2014, Masella instructed her to falsify a DWI report, and she had complied with that instruction. Drake also reported that she was being "wrongfully targeted." Compl. ¶ 59. Drake was scheduled to meet with the Manchester Chief of Police (who contacted her directly to inform

her that the Manchester Police Department was "expediting her
hiring process to get her out of New Boston as quickly as
possible before her career would be sabotaged") in mid-June as
the final step of the hiring process.  Id.  The Manchester
Police Department gave Drake a potential hire date of June 24,
2015.

At a meeting with Chief Brace on April 17, 2015, Drake
spoke with him about morale issues within the New Boston Police
Department, and told him there was "a lot of negativity
regarding the upper echelon of the police department."  Compl.
¶ 60.  She told Chief Brace that Masella spoke unfavorably about
NBPD patrol officers, especially female officers, that Masella
had belittled her about her report writing in front of other
employees, and again mentioned that Masella had called her a
"liar" following the U-Haul truck stop.  Again, Chief Brace told
Drake that she should follow the chain of command, and raise
those issues directly with Masella.

On April 24, 2015, over two months after Drake and Aiken
had reported Masella's conduct to Widener, Sergeant Widener
filed a complaint against Masella with Chief Brace regarding
Drake's allegations of Masella's sexual harassment and the

September 2014 DWI report.[2]  Within hours, Drake was interrogated

by Chief Brace, with Sergeant Widener and Masella present

(despite the fact that interrogating Drake in Masella's presence

was a violation of the Sexual Harassment Policies of the Police

Department and the Town).  Chief Brace "belittled and bombarded

[Drake] with questions."  Compl. ¶ 69.  When the parties

discussed the U-Haul truck stop incident, Masella again called

Drake a "liar."  When Chief Brace failed to correct Masella's

behavior, Drake understood that Chief Brace would not

investigate Masella's wrongdoing, and that efforts to report

Masella's misconduct would be futile and "disastrous" to her

career.  Compl. ¶ 64.  Chief Brace told Drake that "maybe the

police department would be better if [she] were gone."  Compl.

¶ 68.  Drake "left the interrogation distraught, defeated and

uncomfortable."  Compl. ¶ 69.

    That night, Chief Brace sent a department memo to all

employees, stating that Drake had raised concerns about officer

morale.  He dismissed those concerns as "baseless," writing: "I

heard some rumors today that are simply not true."  Compl. ¶ 70.

---

[2]    Shortly after Widener filed the complaint against
Masella on Drake's behalf, Chief Brace recommended to the New
Boston Board of Selectmen that Sergeant Widener be suspended or
demoted for purported violations of NBPD policy.  Widener
subsequently resigned.

The very next day, Drake's work schedule was modified from the day shift to the midnight shift, effective immediately (despite the fact that Drake had been scheduled to work the day shift through July 4, 2015). Chief Brace wrote a memo to Drake, stating that her schedule change was in the "best interests" of the NBPD, and that she would not be with the NBPD much longer. As of June 25, 2015, (Drake's purported start date with the MPD), Drake was removed from the schedule. Chief Brace told Drake that, if "things changed" (with respect to her application with the MPD), she would be added back to the schedule. Compl. ¶ 75.

In early May of 2015, MacDonald spoke with Chief Brace regarding Masella's inappropriate conduct towards Drake and other female employees of the NBPD. Rather than investigating MacDonald's complaint as required, Chief Brace told MacDonald "if Drake wanted to go down the road of a sexual harassment investigation that 'we' will deal with it with a 'rebuttal.'" Compl. ¶ 72. "Rebuttal" was a term Chief Brace used to denote "an attack on the complainant's character, history, [and] performance," designed to undermine the complainant's credibility. Id. at ¶ 73. Chief Brace then told MacDonald he "would never hire another female officer again." Compl. ¶ 73.

Chief Brace did not interview Drake to investigate MacDonald's complaint. MacDonald later resigned from the NBPD.

Around May 22, 2015, after Drake had worked a 10-hour midnight shift, Chief Brace called her to a conference room, purportedly to conduct an internal investigation into Masella's sexual harassment. Instead, Chief Brace was initiating an internal investigation of Drake arising out of Masella's allegation that Drake had altered the September 2014 DWI report ("September 2014 Report") on her own. Brace did not inform Drake of her Miranda rights or give her a Garrity Warning,[3] nor was Drake permitted to have counsel present during the interview. Chief Brace asked Drake a few questions about Masella's inappropriate sexual comments, but appeared far more

---

[3] The New Hampshire Supreme Court has described a "Garrity Warning" as follows:

> Such a warning informs the accused that the purpose of questioning is to assist in determining whether to impose administrative discipline. Even if the accused were to disclose during questioning information indicating that he may be guilty of criminal conduct, the warning explains that neither his self-incriminating statements, nor the fruits thereof will be used against him in any criminal proceeding. The warning further states that if the accused refuses to answer questions or fails to give truthful answers, he will be subject to disciplinary action, up to and including dismissal.

In re Waterman, 154 N.H. 437, 442 (2006) (citation and quotation marks omitted).

focused on the September 2014 Report.  Drake explained to Brace
that Masella had instructed her to modify the report.  Later
that day, following the interview, Drake received a text message
from Chief Brace instructing that she should not discuss the
ongoing internal investigation with anyone.  Masella did not
receive similar instructions from Brace.

Chief Brace then left for vacation in Aruba with Masella.
On June 3, 2015, while in Aruba with Masella, Chief Brace
arranged a meeting with Jane Young, Assistant Attorney General
of the New Hampshire Attorney General's office, and Dennis
Hogan, Hillsborough County Attorney for June 8, 2015, to discuss
whether Drake should be placed on the "Laurie List" as a result
of the September 2014 Report.[4]  At the June 8, 2015, meeting,
Young, Hogan and Chief Brace determined that Brace would submit
a "Laurie Letter" to the Hillsborough County Attorney's Office
for Drake's falsification of the September 2014 Report, and that
Drake would be placed on the "Laurie List."  Masella's

---

[4]     The "Laurie List," which takes its name from the New
Hampshire Supreme Court case, State v. Laurie, 139 N.H. 325, 329
(1995), is an "an informal list of police officers who have been
identified as having potentially exculpatory evidence in their
personnel files or otherwise."  Duchesne v. Hillsborough Cty.
Attorney, 167 N.H. 774, 775 (2015); see also Gantert v. City of
Rochester, 168 N.H. 640, 645 (2016) (listing New Hampshire
Attorney General's categories of personnel conduct considered
potential Laurie material, including instances where an officer
deliberately lied in a police report).

involvement in the September 2014 Report was not discussed. Chief Brace also contacted Hillsborough County Sheriff's Department Deputy Chief Gary Fisher, and asked him to conduct an independent investigation into Drake's allegations.[5]

On June 8, 2015, Drake filed a charge of discrimination with the New Hampshire Commission for Human Rights and the United States Equal Employment Opportunity Commission.

On June 9, 2015, following Brace's meeting with Young and Hogan, he again interviewed Drake. At that time, Brace read Drake the Garrity warning, but did not provide authorization from the New Hampshire Attorney General's office or the Hillsborough County Attorney's office granting her immunity for her statements (as was protocol). And, despite Drake's repeated requests, Brace refused to allow Drake's counsel to be present. Chief Brace informed Drake that the investigation was internal, not criminal, but then stated that the New Hampshire Attorney General's office and the Hillsborough County Attorney's office were investigating as well (making clear that a criminal investigation had, in fact, been undertaken). Following the interrogation, Brace informed Drake that she was being placed on

_____

[5]    Brace initially invited Fisher to attend the June 8, 2015, meeting, but, at Young's suggestion, that invitation was withdrawn.

administrative leave pending the outcome of Fisher's investigation. Masella was not placed on administrative leave.

Brace subsequently contacted the attorney representing the defendant in the September 2014 Report incident, and informed that attorney that Drake was involved in an internal investigation relating to the DWI arrest report.

On July 23, 2015, Brace wrote to Hogan concerning the timing of the issuance of Drake's "Laurie Letter." Brace stated that, after receiving Drake's complaint with the EEOC and NH Human Rights Commission, he had met with the New Bedford Town Attorney. He wrote to Hogan: "Town counsel recommended we proceed cautiously with each and every step as we move forward. They suggest that if [the Police Department] were to issue a [Laurie Letter] before the [internal] investigation is concluded, it would create an appearance that the Town pre-disposed the case without reviewing the facts." Compl. ¶ 92. Brace further wrote Hogan that the Town would defeat Drake's sexual harassment complaint, since her complaint was a "ruse" to protect Drake from disciplinary action relating to the September 2014 Report.

Then, on July 28, 2015, Brace emailed Assistant County Attorney Maureen O'Neil, indicating that Drake's "Laurie Letter"

should be issued to the County Attorney, despite the fact that Fisher's internal investigation had not yet been completed. Brace wrote, "Drake and Attorney Soltani have created a situation that anything we do will be viewed as retaliation and discriminatory."  Compl. ¶ 95.

Fisher's investigation was completed in early October 2015. However, throughout the investigation, Fisher regularly sent drafts of his report to Chief Brace for review and revision. Fisher and Brace also had several phone conversations concerning the investigation.  Brace was permitted to modify Fisher's draft reports, and to "control the direction of the investigation." Compl. ¶ 97.

On December 8, 2015, Brace appeared at Drake's home in uniform, in a police cruiser.  He informed Drake that the encounter was being audio recorded via the police cruiser's recording system, and that he was delivering documentation, including his recommendation that she be terminated.  He handed Drake an envelope containing two letters, both addressed to Drake and written by Brace.  The first letter notified Drake that Brace would be recommending her termination from the New Boston Police Department for filing the false September 2014 Report.

The second letter was a "written warning" to Drake for
purportedly violating New Boston's sexual harassment policy.
The letter stated that, because Drake had no prior disciplinary
action in her personnel file, Brace was issuing a written
warning for what was characterized as a "level two" offense.
The warning required Drake's attendance at a "sexual harassment
in the workplace" training, as well as departmental training
with Brace concerning New Boston's procedures relating to sexual
harassment.  The written warning states: "While there is clear
evidence that mutual behaviors occurred between you and Masella,
the sexual jokes or comments discussed within the report are not
appropriate and cannot be tolerated in the workplace."  Compl.
¶ 106.

Drake exercised her right to a hearing before New Boston's
Board of Selectmen.  Prior to the hearing, Drake requested the
December 8, 2015, audio recording Brace had referenced.  The
Town denied that any such audio recording existed.  On December
8, 2015, following a hearing, the town terminated Drake's
employment.

Masella was not disciplined for ordering Drake to modify
the September 2014 Report, or for releasing the report outside
the NBPD.  And, with respect to Masella's additional offensive
and inappropriate conduct, Brace testified during Drake's

termination hearing that he had "talked to" Masella concerning the "mutual behaviors."  Compl. ¶ 107.

Despite Drake's earlier assurances of employment from the Manchester Police Department, Brace, Masella and Fischer led the Manchester Police Department to believe that Drake lacked credibility, and would be placed on "Laurie's List."  As a result, Drake's job offer from the MPD failed to materialize.

On June 8, 2016, Drake filed a second charge of discrimination with the NH Human Rights Commission and the EEOC. She subsequently filed this suit, asserting claims against the Town, its Selectmen, Brace, Fisher, and Masella for: civil conspiracy, defamation, interference with contractual relationship, intentional infliction of emotional distress, negligent infliction of emotional distress, violation of New Hampshire's whistle-blower statute, civil rights violations, wrongful termination, violation of New Hampshire's Law Against Discrimination, Title VII violations, violation of NH RSA 98-E, intentional interference with prospective contractual relations, and violation of NH RSA 41:48.

The Town Defendants' motion to dismiss followed.

## DISCUSSION

### Consideration of Materials Outside the Pleadings

Before reaching the merits of the Town Defendants'
arguments, the court must first address the parties' arguments
regarding consideration of documents outside the pleadings.

In support of their motion to dismiss, the Town Defendants
cite to the June 8, 2015, charge of discrimination filed by
Drake, which they contend the court may consider because Drake
relies upon the charge, and specifically references it in the
complaint.  Drake responds that her complaint merely mentions
the charge of discrimination, which, she argues, is not
"sufficient reference."  Obj. to Mot. to Dismiss at p. 3.
However, she argues, if the court determines that the charge of
discrimination can be considered, the Town Defendants' motion
should be converted to one for summary judgment, and the court
should then consider those additional documents constituting the
administrative record before the New Hampshire Commission for
Human Rights.

As noted earlier, "[o]rdinarily ... any consideration of
documents not attached to the complaint, or not expressly
incorporated therein, is forbidden, unless the proceeding is
properly converted into one for summary judgment under Rule 56.
See Fed. R. Civ. P. 12(b)(6).  However, courts have made narrow

exceptions for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint." Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993) (citations omitted).

Drake refers to the charge of discrimination in her complaint on multiple occasions, and, as the Town Defendants point out, the charge is a central part of her retaliation claims against the defendants. See Compl. ¶¶ 85, 111-112, 190-191, 209. And, Drake seemingly does not dispute the authenticity of the document. Accordingly, the court finds the charge of discrimination is "sufficiently referred to in the complaint," Watterson, 987 F.2d at 3, and can be considered without converting the Town Defendants' motion to one for summary judgment. See Barber v. Verizon New England, Inc., No. C.A. 05-390ML, 2005 WL 3479834, at *1 n.1 (D.R.I. Dec. 20, 2005) ("While a court deciding a Rule 12(b)(6) motion is normally constrained to consider only the plaintiff's complaint, a court may nonetheless take into account a document whose contents are linked to the complaint and whose authenticity is not challenged, such as a charge of discrimination filed with the Commission, without converting the motion into a summary judgment request.") (citing Beddall v. State St. Bank and Trust

Co., 137 F.3d 12, 17 (1st Cir. 1998); see also Cintron-Garcia v. Supermercados Econo, Inc., 818 F. Supp. 2d 500, 506 (D.P.R. 2011) (collecting cases for the proposition that an EEOC charge may be considered at the motion to dismiss stage as an official public record).

### Count 1 - Civil Conspiracy (Brace, Masella, Fisher)

Moving on to the merits of the Town Defendants' argument, the court first addresses Drake's civil conspiracy claim.  In support of that claim, Drake alleges that Brace, Masella, and Fisher entered into "overt or covert" agreements to "file false complaints against Drake, coerce or facilitate coverups, obfuscate, or delay the discovery of truth" in an effort to conceal Masella's illegal conduct, and engaged in acts to, inter alia, "conduct an improper, biased investigation" in an effort to force Drake out of her job.  Compl. ¶ 123.  The Town Defendants say that Drake's civil conspiracy charge against Chief Brace must be dismissed because she fails to allege facts supporting the existence of an agreement between Brace and the other purported conspirators.

Under New Hampshire law, the "essential elements" of civil conspiracy are: (1) two or more persons; (2) an object to be accomplished (i.e., an unlawful object to be achieved by lawful

or unlawful means, or a lawful object to be achieved by unlawful means); (3) an agreement on the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result thereof.  Jay Edwards, Inc. v. Baker, 130 N.H. 41, 47 (1987).

Drake never squarely alleges that Brace, Masella and Fischer agreed to undertake a joint course of action.  Instead, she asks the court to infer from the complaint that a tacit agreement existed between the three.  She points to a series of allegations that she says support an inference that an agreement existed between them.  Bluntly put, those factual allegations do not support her argument.  Drake's complaint is utterly lacking any factual allegations that would support a plausible inference that Brace, Fisher and Masella entered into an agreement to conspire against her.  For that reason, the Town Defendants' motion to dismiss the conspiracy claim against Brace is granted, albeit without prejudice.  To the extent Drake can plausibly, and in good faith, assert factual allegations that would support a cognizable claim for civil conspiracy, she may file a motion to amend her complaint within 30 days of the date of this order. See Ashcroft v. Iqbal, 556 U.S. at 678 ("A claim has facial plausibility when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.").

**Count 2 – Defamation and Defamation Per Se (All Defendants)**

The Town, Brace, Lovejoy, Constance, and Quirk have moved to dismiss Drake's defamation claim against them.  Drake agrees that her defamation claim against these defendants should be dismissed.  <u>See</u> Obj. to Mot. to Dismiss at pp. 10-11, 25 (requesting that the court "GRANT the motion to dismiss Count II as to defendants Brace, Town and the individual selectmen."). Accordingly, the Town Defendants' motion to dismiss Drake's defamation claim is granted.

**Count 3 – Intentional Interference with Contractual Relationship (Masella, Brace, and Fisher)**

The Town Defendants have also moved to dismiss Drake's intentional interference with a contractual relationship claim against Brace.

In order to state a claim for intentional interference with contractual relations under New Hampshire law, Drake must allege that: (1) she had a contractual relationship with a third party; (2) defendants knew of that contractual relationship; (3) defendants wrongfully induced the third party to breach the contract; and (4) Drake's damages were proximately caused by

defendants' interference.  <u>Wilcox Indus. Corp. v. Hansen</u>, 870 F.
Supp. 2d 296, 306 (D.N.H. 2012) (citing <u>Roberts v. General</u>
<u>Motors Corp.</u>, 138 N.H. 532, 539, 643 A.2d 956 (1994))
(additional citations omitted).

In support of her claim, Drake alleges that Brace, Masella
and Fisher knowingly and wrongfully interfered with her
employment relationship with the Town of New Boston.  The Town
Defendants argue that the claim against Brace must be dismissed
because: (1) Brace merely reported truthfully to the Town that
Drake lied on a police report (which Drake concedes in her
complaint); (2) Brace was privileged to act on behalf of the
Town to investigate Drake's conduct, and recommend her
termination; and (3) because Brace acted as the Town's agent and
Drake's co-employee, there was no "third person" contract with
which Brace could interfere.

The Town Defendants' arguments are unconvincing.  In
response to the Town Defendants' first argument, Drake notes
that she has alleged that Brace "did more than mere honest
recitation of the whole truth."  Obj. to Mot. to Dismiss at
p. 11.  The court agrees.  Drake alleges multiple acts by Brace
which she contends interfered with her contractual relationship
with the Town of New Bedford, including Brace's purported
failure to comply with Town policies and procedures when

investigating the September 2014 Report and Drake's allegations against Masella.

The Town's second argument is similarly unpersuasive. The Town relies on the Restatement (Second) of Torts § 770, which states: "One who, charged with responsibility for the welfare of a third person, intentionally causes that person not to perform a contract . . . does not interfere improperly with the other's relation if the actor (a) does not employ wrongful means and (b) acts to protect the welfare of the third person." Restatement (Second) of Torts § 770 (1979) (emphasis added). Here, however, Drake has sufficiently alleged that Brace employed "wrongful means," by, inter alia, retaliating against her for reporting Masella's offensive conduct by failing to conduct a fair investigation consistent with the Town's and NBPD's policies and procedures.

The Town's third argument, that, because Brace acted as the Town's agent and Drake's co-employee, there was no "third person" contract with which Brace could interfere also fails. The Town is correct that, generally, "[i]n the context of interference with an employment contract by a fellow employee, an employer may be a third party only if the fellow employee was acting outside the scope of his employment." O'Neill v. Valley Reg'l Health Care, Inc., No. 00-441-JD, 2001 WL 276968, at *3

(D.N.H. Mar. 21, 2001) (citations omitted).  An employee may be found to be acting outside the scope of employment if he is "motivated by actual malice, where actual malice is defined as bad faith, personal ill will, spite, hostility, or a deliberate intent to harm the plaintiff.'"  Preyer v. Dartmouth College, 968 F. Supp. 20, 26 (D.N.H. 1997) (quoting Soltani v. Smith, 812 F. Supp. 1280, 1297 (D.N.H. 1993)) (additional citations omitted).  Drake sufficiently alleges that Brace acted with malice (see, e.g., Compl. ¶ 138), and for that reason, the Town Defendants' final argument fails as well.

For all those reasons, the Town Defendants' motion to dismiss Drake's intentional interference with contractual relationship claim against Brace is denied.

### Count IV – Intentional Infliction of Emotional Distress (All Defendants)

The Town Defendants have moved to dismiss Drake's intentional infliction of emotional distress claim against them on two bases.  First, the Town Defendants argue that Drake's intentional infliction claim against the Town fails because it is barred by the exclusivity clause in the workers' compensation law.  Drake does not object to dismissal of her claim against the Town.  See Obj. to Mot. to Dismiss at p. 14.

Second, the remaining Town Defendants argue that Drake has
not stated a claim against them because she has not sufficiently
alleged extreme and outrageous conduct by Brace or the
Selectmen.  Drake disagrees, relying on Yale v. Town of
Allenstown, 969 F. Supp. 798 (D.N.H. 1997), arguing that the
defendants' conduct here was far worse than the conduct
described in Yale.  Brace, Drake contends, was "placed on
notice, and as policy[-]maker for the town[,] he retaliated with
a vengeance in the series of star chamber sessions, [an]
investigation causing her termination, and to finally holding
Drake responsible for violation of sexual harassment rendering
her unemployable throughout the state."  Obj. to Mot. to Dismiss
at p. 14.  The Selectmen, she argues, were aware of the details
of the conduct described in Drake's complaint, and "added their
own contribution of offensive conduct" by "imposing no
corrective sanctions against the abuser," or "preventative
practices."  Id.  Instead, they fired Drake.  Id.

"In order to make out a claim for intentional infliction of
emotional distress, a plaintiff must allege that a defendant 'by
extreme and outrageous conduct, intentionally or recklessly
cause[d] severe emotional distress to another.'"  Tessier v.
Rockefeller, 162 N.H. 324, 341 (2011) (quoting Morancy v.
Morancy, 134 N.H. 493, 496 (1991).  "'In determining whether

conduct is extreme and outrageous, it is not enough that a

person has acted with an intent which is tortious or even

criminal, or that he has intended to inflict emotional distress,

or even that his conduct has been characterized by malice.'"

Id. (quoting Mikell v. Sch. Admin. Unit No. 33, 158 N.H. 723,

729 (2009)).  Instead, a plaintiff must allege conduct "so

outrageous in character, and so extreme in degree, as to go

beyond all possible bounds of decency, and to be regarded as

atrocious, and utterly intolerable in a civilized community."

Id. (citations omitted).

       As a preliminary matter, "[c]ourts have rarely found

workplace misconduct sufficiently outrageous to constitute

intentional infliction of emotional distress."  Purdy v. City of

Nashua, No. 98-627-JD, 2000 WL 620579, at *10 (D.N.H. Apr. 17,

2000) (collecting cases).  However, in the case upon which Drake

relies, Yale v. Town of Allenstown, 969 F. Supp. at 799, the

plaintiff, a former police officer, asserted an intentional

infliction of emotional distress claim, alleging that the

defendant (her field training officer) repeatedly made sexual

advances toward her "comprised of vulgar remarks, sexual

innuendo and non-consensual touching," despite plaintiff's

repeated rejection of those advances.  The plaintiff further

alleged that the defendant made persistent harassing phone calls

to her while they were off-duty, and, when plaintiff rejected

his advances, spread rumors about her in order to humiliate her.

Id. Finally, the plaintiff alleged that the defendant stood

behind her while she worked on a written exam, and drew his

firearm in violation of department policy, leading plaintiff to

believe she was about to be shot. Id. The court denied

defendant's motion to dismiss the claim, finding that the

plaintiff had sufficiently alleged extreme and outrageous

conduct. Id. at 801.

Drake's reliance on Yale, however, is misplaced. The party

moving to dismiss the claim in Yale was the perpetrator of the

harassment. Drake does not allege that Brace, himself,

subjected her to sexually harassing statements, or engaged in

threatening conduct. Instead, Drake alleges that Brace

retaliated against her for reporting Masella's offensive conduct

by failing to conduct a fair investigation into her allegations,

and by recommending her termination. Such allegations are not

sufficient to show sufficiently extreme and outrageous conduct.

See Maynard v. Meggitt-USA, Inc., No. 14-CV-467-LM, 2015 WL

1538004, at *3 (D.N.H. Apr. 7, 2015) ("In the workplace, false

accusations, inadequate investigations, humiliating treatment,

and abuse of authority generally do not amount to outrageous or

atrocious conduct sufficient to state a plausible [intentional infliction of emotional distress] claim.") (collecting cases).

That is true of Drake's allegations in support of her claim against the Selectmen as well.  Drake alleges that the Selectmen wrongfully terminated her employment, and failed to take action against Masella.  Those allegations do not come close to meeting the requisite "atrocious or utterly intolerable" standard.  See Konefal v. Hollis/Brookline Coop. Sch. Dist., 143 N.H. 256, 260, 723 A.2d 30, 33–34 (1998) ("'Although discharging an employee ... may be illegal and reprehensible, a great deal more is required to approach outrageous conduct.  Such conduct is bad conduct, but it is not outrageous and intolerable conduct.'") (quoting Lococo v. Barger, 958 F. Supp. 290, 298 (E.D. Ky. 1997)).[6]

Accordingly, the Town Defendants' motion to dismiss Drake's intentional infliction of emotional distress claim against the Town, Brace and the Selectmen is granted.

---

[6]     To the extent counsel now claims that the complaint adequately alleges that Brace and the Selectmen are vicariously liable for intentional infliction of emotional distress, he has failed to provide adequate legal support for such a claim.

## Count V – Negligent Infliction of Emotional Distress
## (All Defendants)

Drake does not object to dismissal of this claim.  <u>See</u> Obj. to Mot. to Dismiss at p. 15.  Accordingly, the Town Defendants' motion to dismiss Drake's negligent infliction of emotional distress claim is granted.

## Count VII – Section 1983 – Procedural and Substantive Due
## Process; First Amendment (All Defendants)

The Town Defendants have also moved to dismiss Drake's Section 1983 claims against them.  Drake asserts a procedural due process claim, a substantive due process claim, and a claim for violation of her First Amendment rights.

In support of her procedural and substantive due process claim, Drake alleges that she had a property interest in her position as a police offer, a liberty interest in pursuing and engaging in her chosen profession, and a right to avail herself of all internal, administrative and legal remedies.

She alleges that, pursuant to the Town's written policies and procedures, as well as the Standard Operating Procedures of the New Boston Police Department, she was entitled to "fair treatment," and a "truthful, fair, speedy, prompt and impartial investigation" required to be completed within 30-days.  Compl. ¶ 159.  Instead, Drake alleges, the investigation took five

months, and was not impartial because Brace had "full access and exercised continuous influence" throughout the investigatory process. Compl. ¶ 160. She further alleges that, while the investigation was pending and she was on administrative leave, she did not receive "overtime, detail pay or holiday pay she was routinely accustomed to receiving," which reduced the value of her pension. Compl. ¶ 166-167. And, Drake says, the Town, the Selectmen, and Brace did not follow "appropriate procedures" "that were in place" when terminating her employment. Compl. ¶ 168. Thus, Drake says, she was deprived of her liberty and property interests without due process.

### 1.  Procedural Due Process

The Town Defendants contend that Drake has not stated a procedural due process claim because her allegations demonstrate that, prior to termination of her employment, the Town provided Drake with the procedural guarantees to which she is entitled as a public employee: notice, an explanation of the employer's evidence against her, and an opportunity to present her side of the story.

Drake concedes that she was given notice of a hearing, an opportunity to testify, and was allowed to cross examine Brace and Masella. However, she argues, the process she received was

"corrupt." Obj. to Mot. to Dismiss at p. 17. In support of
that argument, she points to her allegations regarding the
partiality and bias of Fisher's purportedly independent
investigation (which, she contends, the Selectmen accepted as
impartial), including Brace's alleged involvement in reviewing
and revising drafts of the investigation report. She argues
that the "entire proceeding was pre-determined and engineered by
Brace with the all too willing assistance of Masella and
Fisher." Obj. to Mot. to Dismiss at p. 18.

To state a procedural due process claim, a plaintiff must
allege deprivation of a protected liberty or property interest
by the defendants without constitutionally adequate process.
See Senra v. Town of Smithfield, 715 F.3d 34, 38 (1st Cir.
2013). The Town Defendants assume arguendo that Drake has
sufficiently alleged a protected interest, and the court will as
well. Therefore, the relevant inquiry is whether Drake has
sufficiently alleged that she was "deprived of that property
interest without the minimum amount of process that was due
under the Constitution including 'some kind of hearing' and
'some pretermination opportunity to respond.'" Senra, 715 F.3d
at 38-39 (quoting Cleveland Bd. of Educ. v. Loudermill, 470 U.S.

532, 542 (1985) (internal punctuation omitted).  As our court of appeals has observed:

> The Supreme Court made clear in [Cleveland Bd. of Educ. v.] Loudermill that when an employee is entitled to some process after termination, the purpose of the termination hearing is solely to serve as "an initial check against mistaken decisions — essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action."  470 U.S. [532], 545-46 [(1985)].  It "need not be elaborate" as long as an employee receives (1) "oral or written notice of the charges against him," (2) "an explanation of the employer's evidence," and (3) "an opportunity to present his side of the story."  Id.

Chmielinski v. Massachusetts, 513 F.3d 309, 316 (1st Cir. 2008).

It is evident from Drake's complaint that she received notice, an explanation of the evidence against her, and an opportunity to present her side of the story.  See Compl. ¶¶ 102, 107, 108, 109.  And, as previously mentioned, Drake does not dispute that point.  But, Drake argues, the process she received was infected with bias and impartiality.  With respect to bias, the First Circuit has held "that there is no requirement that the hearing officer be impartial; indeed, the terminating employer may preside....  But that impartiality is not demanded does not itself determine whether bias can be so severe as to interfere with due process at the hearing itself."  Jackson v. Norman, 264 Fed. Appx. 17, 19 (1st Cir. 2008) (quoting Chmielinski v. Massachusetts, 513 F.3d 309, 318 (1st

Cir. 2008)). "To demonstrate such a due process violation
. . ., the plaintiff would have to show that the alleged bias
'deprived [her] of the opportunity to put [her] facts before the
decisionmaker, or that there was an [ ] error of primary facts
in the grounds used for termination that could be explained only
by bias.'" Id. (quoting Chmielinski, 513 F.3d at 318).

Drake does not allege that she was deprived of the
opportunity to put her facts before the decisionmakers at her
termination hearing before the Selectmen. See Chmielinski, 513
F.3d at 318 (noting that "[a] key concern in Loudermill was that
the employee have an opportunity to present his side of things
to correct errors of fact on which the termination decision is
based") (citing Loudermill, 470 U.S. at 545–46). Nor does Drake
allege any facts that support her argument that the hearing was
"predetermined" by Brace (especially given that Brace was not
the decisionmaker). See Gonzalez-Droz v. Gonzalez-Colon, 660
F.3d 1, 15 (1st Cir. 2011) ("Certainly, 'a biased decisionmaker
[is] constitutionally unacceptable.' But Jiménez's duties as
the Board's investigative officer do not involve
decisionmaking.") (quoting Withrow v. Larkin, 421 U.S. 35, 47
(1975)). And, critically, Drake does not allege any facts that
would support a plausible inference that the Selectmen made a

decision to terminate her prior to the hearing, and that the hearing was therefore a sham. See Chmielinski, 513 F.3d at 318

Instead, Drake's allegations of bias and impartiality relate to Fisher's investigative process, including Brace's purported involvement, and the investigative report. But, "[a] person who investigates and presents an agency's case, unlike a decisionmaker, does not have to be neutral." Gonzalez-Droz v. Gonzalez-Colon, 660 F.3d at 15 (citations omitted). And, while Drake alleges that Fisher's investigative report was "defective and biased," she does not allege that Fisher's report itself (upon which she alleges the Selectmen relied in making their termination decision) contained any erroneous factual findings, let alone erroneous factual findings that could be explained only by bias. See Chmielinski, 513 F.3d at 318 (upholding dismissal of procedural due process claim where "[plaintiff's] complaint does not allege anywhere that any alleged bias . . . deprived him of the opportunity to put his version of the facts before the decisionmaker, or that there was any error of primary facts in the grounds used for termination that could be explained only by bias.").

For all those reasons, Drake's allegations are not sufficient to support a claim of a violation of her due process rights.

## 2. Substantive Due Process

The Town Defendants also contend that Drake has not stated a substantive due process claim. Such claims, they say, are limited to government action that is conscious-shocking, and Drake's allegations do not come close to meeting that standard. The court agrees that Drake has not pled facts sufficient to support a substantive due process claim.

"The constitutional guarantee of substantive due process 'functions to protect individuals from particularly offensive actions on the part of government officials.'" Gonzalez-Droz, 660 F.3d at 15-16 (quoting Pagán v. Calderón, 448 F.3d 16, 32 (1st Cir. 2006)). Put differently, "a substantive due process claim implicates the essence of state action rather than its modalities." Id. (internal quotations omitted). To state a substantive due process claim, Drake must show "that the challenged actions were 'so egregious as to shock the conscience.'" Id. (quoting Pagán, 448 F.3d at 32). "[T]he challenged conduct must be 'truly outrageous, uncivilized, and

intolerable.'" Id. (quoting Hasenfus v. LaJeunesse, 175 F.3d 68, 72 (1st Cir. 1999)).

The "hallmark" of a successful substantive due process challenge "is an extreme lack of proportionality, as the test is primarily concerned with violations of personal rights so severe, so disproportionate to the need presented, and so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience." Gonzalez-Fuentes v. Molina, 607 F.3d 864, 881 (1st Cir. 2010) (citation and internal punctuation omitted). Necessarily, then, the threshold for stating a viable Fourteenth Amendment substantive due process claim is a high one, "lest the Constitution be demoted to what we have called a font of tort law." County of Sacramento v. Lewis, 523 U.S. 833, 847 n.8 (1998). See also id. at 848 ("It should not be surprising that the constitutional concept of conscience-shocking duplicates no traditional category of common-law fault, but rather points clearly away from liability, or clearly toward it, only at the ends of the tort law's spectrum of culpability. Thus, we have made it clear that the due process guarantee does not entail a

body of constitutional law imposing liability whenever someone

cloaked with state authority causes harm.").

Viewing this body of law from a slightly different

perspective, the court of appeals has collected representative

cases in which the plaintiffs did state a viable substantive due

process claim:

> Among the cases in which plaintiffs have prevailed [on
> substantive due process claims] are those involving a
> student blinded in one eye when a coach intentionally
> struck him in the head with a metal weight; a
> teacher's fabrication of sexual abuse charges against
> a father, resulting in loss of contact with his child
> for three years; rape by a police officer in
> connection with a car stop; a 57-day unlawful
> detention in the face of repeated requests for
> release; police officers aiding a third-party in
> shooting the plaintiff; an intentional assault by a
> police officer who struck a pretrial detainee twice in
> the head and threatened to kill him; and a principal
> forcing his way into a room where a student was
> hiding, grabbing her from the floor, throwing her
> against the wall, and slapping her.

Cummings v. McIntire, 271 F.3d 341, 346 (1st Cir. 2001)

(footnote and citations omitted).  While it is plain that the

"shocks-the-conscience" test imposes a heavy burden on

plaintiffs seeking to vindicate substantive due process rights,

it is also somewhat vague.  As the court of appeals has noted:

> The "shock the conscience" test has been labeled
> "admittedly imprecise," "virtually standardless,"
> "somewhat amorphous," and "laden with subjective
> assessments."  Descriptions of what actions qualify as
> "conscience-shocking" often descend into a morass of
> adjectives that are as nebulous as they are

pejorative, including "truly irrational," "extreme and egregious," "truly outrageous, uncivilized, and intolerable," and "stunning." Meanwhile, actions that have not been found to shock the conscience have still been described as "despicable and wrongful." It would seem that, at least at the margins, the shock-the-conscience test requires us to split the hairs of opprobrium.

Gonzalez-Fuentes, 607 F.3d at 879-81 (citations omitted).

Drake's complaint groups her substantive due process claim together with her procedural due process and First Amendment claims, with no effort to identify exactly what specific allegations she believes support her substantive due process claim. However, in her brief, Drake argues that the following allegations constitute "truly horrendous" conduct, and support her claim: (1) "a superior officer, charged with upholding and enforcing the laws of [the] state," ordered "a subordinate to falsify a police record;" (2) a female officer was terminated for a violation for which a male officer received no discipline; (3) a female officer was interrogated about a sexual harassment complaint in the presence of the perpetrator; and (4) a female officer was unjustly deprived of ever working as a police officer because she followed a superior officer's orders. Obj. to Mot. to Dismiss at pp. 18-19.

With respect to the Town Defendants, Drake alleges that they retaliated against her after she reported Masella's

improper conduct, resulting in an unfair investigation into her allegations and conduct, and ultimately her wrongful termination.  Assuming that the Town Defendants' conduct was motivated by bad faith, courts have found such allegations insufficient to give rise to a substantive due process claim. See, e.g., Thomas v. Town of Salisbury, 134 F. Supp. 3d 633, 647 (D. Mass. 2015) ("In the instant case, [plaintiff] has not claimed more than an allegedly unfair investigation and termination, which was eventually reversed through the prescribed appellate process.  He has cited no cases, and none have been found, where such conduct, even if motivated by bad faith, supports a substantive due process violation."); Kraft v. Mayer, No. 10-CV-164-PB, 2012 WL 235577, at *6 (D.N.H. Jan. 25, 2012) ("Even assuming that [plaintiff]'s termination resulted from [defendants'] retaliatory animus and that other . . . administrators condoned the retaliatory termination, their bad faith motivation is insufficient to amount to conscience-shocking behavior.") (collecting cases); Cf., Frei v. Town Of Holland, 212 Fed. Appx. 4, 6 (1st Cir. 2007) ("The substantive due process claim based on allegations of perjury, falsification of documents, and retaliatory action, fails under this circuit's case law.") (citing cases).

Similarly, Drake's allegations that she was ordered to falsify the September 2014 Report are insufficient to sink to the "conscious shocking" level of a substantive due process violation. Drake fails to cite a single case that would bolster her position that such conduct was sufficiently egregious as to shock the conscious. And, as stated by the court in <u>Kraft v. Mayer</u>, 2012 WL 235577 at *5, "[a] review of case law involving non-physical conduct . . . illustrates that the threshold for establishing the requisite abuse of government power is high." (citing in support <u>Cruz-Erazo v. Rivera–Montañez</u>, 212 F.3d 617, 622-23 (1st Cir. 2000) (holding that months of harassment by police officers, which included threats of physical violence, insults, and the filing of unjustified charges, did not rise to the level of conduct that shocks the conscience); <u>Pittsley v. Warish</u>, 927 F.2d 3, 7 (1st Cir. 1991) (concluding that police conduct was "despicable and wrongful," but not conscience-shocking, where police officers repeatedly threatened to kill plaintiff and once threatened plaintiff's children with never seeing their father again); and <u>Phelps v. Bracy</u>, Civ. Action No. 06–40090–GAO, 2007 WL 2872458, at *3 (D. Mass. Sept. 27, 2007) (allegations that a corrections officer threatened, yelled at, swore at, physically intimidated, and appeared to intend

imminent harm to a civilly committed person were insufficient to shock the conscience)).

Accordingly, the Town Defendants' motion to dismiss Drake's substantive due process claim against them is granted.

### 3.   Violation of Drake's First Amendment Rights

Finally, the court addresses the Town Defendants' motion to dismiss Drake's First Amendment claim.  In support of that claim, Drake alleges that she has a constitutional right to engage in free speech "without being ordered to lie," and a right to "report violations of the law."  Compl. ¶ 164.  She says that defendants' actions deprived her of that right, but does not specify exactly which actions taken by the defendants operated to deprive her of her First Amendment rights, or even exactly how she was deprived of those rights.  But, read generously, the gist of Drake's First Amendment claim seems to be that, because she reported misconduct by Masella and Brace, the defendants retaliated against her, ultimately terminating her employment.

The Town Defendants argue that Drake has not stated a claim for violation of her First Amendment rights because she has not adequately alleged that she was speaking as a "citizen."  They contend that Drake's allegations of punished speech (being

ordered to lie on a police report, and reporting alleged

violations of law) were all made in her official capacity as a

police officer.

While not entirely clear from her complaint, Drake seems to

allege two instances of protected speech: (1) her reporting of

Masella's misconduct to her superior officers (in order to, she

alleges, "carry out her duties as a police officer," Compl.

¶ 164); and (2) her reporting of misconduct by Masella and Chief

Brace when she filed a charge with the New Hampshire Human

Rights Commission and the EEOC (the "EEOC charge").  In both

instances, Drake says, she was speaking as a citizen, as she was

not expected to report misconduct by Brace and Masella to "co-

workers, [Brace], [an] investigator, the selectmen, state or

federal agencies, or attorneys" as part of her official

responsibilities.[7]  Obj. to Mot. to Dismiss at p. 17.

"[T]he First Amendment prohibits government officials from

subjecting an individual to retaliatory actions ... for speaking

out."  Decotiis v. Whittemore, 635 F.3d 22, 29 (1st Cir. 2011)

(quoting Mercado-Berrios v. Cancel-Alegria, 611 F.3d 18, 25-26

(1st Cir. 2010) (additional citation omitted).  That "right is

---

[7]     While Drake argues in her brief that she reported
misconduct by Brace and Masella to the Selectmen, Drake's
complaint does not clearly allege that she did so.

not absolute, however; while public employees do not forfeit all of their First Amendment rights by undertaking public employment, 'in recognition of the government's interest in running an effective workplace, the protection that public employees enjoy against speech-based reprisals is qualified.'" Decotiis, 635 F.3d at 29 (quoting Mercado-Berrios, 611 F.3d at 26).

Our court of appeals has articulated a three-part inquiry "[t]o determine whether an adverse employment action against a public employee violates her First Amendment free speech rights." Decotiis, 635 F.3d at 29 (citation omitted).

> First, a court must determine "'whether the employee spoke as a citizen on a matter of public concern.'" Curran v. Cousins, 509 F.3d 36, 45 (1st Cir. 2007) (quoting Garcetti v. Ceballos, 547 U.S. 410, 418 (2006)). Second, the court must "balance ... the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Id. at 44 (quoting Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968)) (omission in original). Third, the employee must "show that the protected expression was a substantial or motivating factor in the adverse employment decision." Id. at 45.

Id. The first step, then, requires that Drake establish: (1) her speech was of public concern; and (2) she spoke as a citizen. Bolduc v. Town of Webster, 629 F. Supp. 2d 132, 146 (D. Mass. 2009).

A.    Internal Reporting of Masella's Misconduct

The Town Defendants seemingly do not dispute that Drake's reporting of Masella's purported misconduct involved a subject of public concern.  It likely was.  See, e.g., Thomas v. Town of Salisbury, 134 F. Supp. 3d at 643 ("[plaintiff's] speaking out about [defendant's] conduct in sexually harassing female employees was on a subject of public concern.  In fact, such disclosures 'are precisely the type of communications that demand strong First Amendment protection.'") (quoting Bennett v. City of Holyoke, 230 F. Supp. 2d 207, 224 (D. Mass. 2002) (statements "regarding corruption and racism within the Holyoke police department *were* on matters of public concern.")) (additional citations omitted).


Next, it must be asked whether Drake, when reporting Masella's misconduct to her superior officers, was speaking in her capacity as a private citizen.  To determine "whether speech is made pursuant to [an] employee's official duties," the "court must ask, 'what are the employee's official responsibilities?,' and second, 'was the speech at issue made pursuant to those responsibilities?" Decotiis, 635 F.3d at 31.

> To determine whether such speech was made pursuant to
> official responsibilities, the Court must take a hard
> look at the context of the speech.  Although no one
> contextual factor is dispositive, we believe several
> non-exclusive factors, gleaned from the case law, are

instructive: whether the employee was commissioned or
paid to make the speech in question; the subject
matter of the speech; whether the speech was made up
the chain of command; whether the employee spoke at
her place of employment; whether the speech gave
objective observers the impression that the employee
represented the employer when she spoke (lending it
"official significance"); whether the employee's
speech derived from special knowledge obtained during
the course of her employment; and whether there is a
so-called citizen analogue to the speech.

Id. (internal citations omitted).

Here, Drake herself alleges that she reported the alleged
misconduct <u>pursuant to her responsibilities as a police officer</u>.
As previously mentioned, Drake alleges that she reported
misconduct to "carry out her duties as a police officer."
Compl. ¶ 164.  She further alleges: "Drake and [another officer]
fulfilled their duty to report sexual harassment in the
workplace by reporting the illegal conduct to their immediate
supervisor."  Compl. ¶ 53.  In light of Drake's repeated
allegations that she was fulfilling her duties as a police
officer by reporting misconduct to her superior officers, the
court is hard-pressed to find that those statements were not
made pursuant to her professional responsibilities as a police
officer.  And, as the Town Defendants point out, applying the
factors described by the court of appeals in <u>Decotiis</u>, Drake
also alleges that she reported the alleged misconduct up the
chain of command, at her place of employment.  While there may

be public citizen analogues, the court cannot conclude, given the allegations in the complaint, that Drake's reports to her superior officers were made in her capacity as a private citizen.

    B.    <u>Filing of an EEOC Charge</u>

Moving on to Drake's filing of the EEOC charge, whether that reporting can be characterized as a matter of public concern is a closer call.  Generally, courts that have considered whether an EEOC charge is protected speech "have eschewed a per se rule against finding such speech is or is not protected, and have instead considered, on a case-by-case basis, whether the nature and content of the EEOC charge at issue relate only to matters directed [at] the employee's self-interest or employment conditions, which are not matters of public concern, or whether the charge relates to or includes other matters which are legitimate matters of public concern." <u>Sanders v. Leake County Sch. Dist</u>., 546 F. Supp. 2d 351, 357 (S.D. Miss. 2008) (collecting cases).  Where the plaintiffs' EEOC charges implicates only the "private employment interests of the plaintiff," courts have held that such conduct does not "constitute[] speech on a matter of public concern." <u>Cutrer v. McMillan</u>, 308 Fed. Appx. 819, 821 (5th Cir. 2009) (citing <u>Short v. City of West Point, Mississippi</u>, 125 F.3d 853 (5th Cir. 1997)

and <u>Ayoub v. Texas A & M Univ.</u>, 927 F.2d 834 (5th Cir. 1986));

<u>see</u> <u>also</u> <u>Cox v. Shelby State Community College</u>, 48 Fed. Appx.

500, 508–509, (6th Cir. 2002) ("EEOC charges, insofar as they

relate to purely personal employment issues, are not public

speech meriting First Amendment protection . . . . The relevant

question, therefore, is whether [plaintiff] was motivated to

file in order to make a statement about racial discrimination in

general on campus, or whether his career was his primary

concern."); <u>Stark v. Univ. of S. Mississippi</u>, 8 F. Supp. 3d 825,

835 (S.D. Miss. 2014) ("Several authorities have found speech to

be private in nature notwithstanding the existence of an EEOC

charge.") (collecting cases); <u>cf</u>. <u>Friel v. Cty. of Nassau</u>, 947

F. Supp. 2d 239, 257 (E.D.N.Y. 2013) (finding protected speech

where plaintiff's EEOC charge concerned how challenged policy

was causing "'system-wide' gender discrimination impacting all

female detectives, not just the Plaintiff").


    Thus, whether an EEOC charge constitutes a purely

personalized grievance requires a highly fact-based analysis.

Drake's complaint fails to allege facts that would support a

plausible inference that her EEOC charge constituted speech on a

matter of public concern. And, her brief fails to address — or

even identify — the issue. "In opposing a Rule 12(b)(6) motion,

a plaintiff cannot expect a trial court to do his homework for

him.  Rather, the plaintiff has an affirmative responsibility to put his best foot forward in an effort to present some legal theory that will support his claim." McCoy v. Massachusetts Inst. of Tech., 950 F.2d 13, 22–23 (1st Cir. 1991).

Accordingly, Drake's First Amendment claim is dismissed, albeit without prejudice to filing a motion to amend the complaint to add such a claim, if she can do so in good faith. In that event, counsel should be prepared to file a thorough and pertinent memorandum of law fully discussing the legal tests applicable in determining the viability of such a claim.

### Count VIII – Section 1983 – Conspiracy to Violate Civil Rights (All Defendants)

Drake alleges that the individually named defendants conspired to deprive Drake of her procedural rights, and her property and liberty interests, in violation of the First, Fifth and Fourteenth Amendments.

The Town Defendants move to dismiss Drake's federal conspiracy claim, arguing that she has not alleged facts sufficient to show (1) an agreement between the defendants to deprive her of rights; or (2) deprivation of her civil rights, and, therefore, has not stated a claim.  The court agrees, and therefore grants the Town Defendants' motion to dismiss Drake's federal conspiracy claim.

## Count X – RSA 354-A: 2, 7, 19 – Sexual Harassment, Aiding & Abetting, Retaliation (All Defendants)

In support of her RSA 354-A claim, Drake alleges that the named defendants unreasonably interfered with her work performance by making inappropriate sexual comments with the intent to create a hostile work environment, or by aiding and abetting that conduct. She says that, through that conduct, the named defendants created a hostile work environment. Drake further alleges that, when she reported that conduct by filing a charge with the EEOC and New Hampshire Human Rights Commission, the individual defendants retaliated against her by orchestrating a biased investigation into her complaint that ultimately led to her termination.

### 1.   Failure to Exhaust Administrative Remedies

The Town Defendants contend that Drake's RSA 354-A claims against Brace, Lovejoy, Quirk and Constance should be dismissed because she has not exhausted her administrative remedies. Drake, the Town Defendants say, filed her charge with the EEOC and New Hampshire Human Rights Commission against the Town and the New Boston Police Department, not against the Selectmen or Brace. Because Drake failed to name those defendants in her administrative complaint, the Town Defendants contend that the court must dismiss Drake's RSA 354-A claims against the

individual defendants for failure to exhaust available administrative remedies.

To bring a claim under New Hampshire's Law Against Discrimination, a party must first timely file a complaint with the New Hampshire Human Rights Commission.  See RSA 354-A:21-a. "Such a complaint must be verified and 'state the name and address of the person ... alleged to have committed the unlawful discriminatory practice complained of and ... set forth the particulars thereof.'"  Carney v. Town of Weare, No. 15-CV-291-LM, 2017 WL 680384, at *6 (D.N.H. Feb. 21, 2017) (quoting RSA 354-A:21(I)(a)).  "Under the Commission's regulations, 'all complaints of employment discrimination' must be filed on an EEOC charge of discrimination form or in a letter incorporating the same information."  Id. (quoting N.H. Code Admin. R. Hum. 202.02(a)).  "Naming a respondent in an administrative complaint is often called a 'charging requirement,' and failure to comply with that requirement 'precludes a claim under RSA 354-A in court.'"  Id. (quoting Wilson v. Port City Air, Inc., No. 13-CV-129-JD, 2013 WL 2631860, at *2 (D.N.H. June 12, 2013)).

"The New Hampshire Supreme Court has not had occasion to consider whether there are any exceptions to RSA 354-A's charging requirement."  Id. at *7.  However, "the New Hampshire

Supreme Court relies on cases developed under Title VII to interpret claims under RSA 354-A." <u>Salisbury v. Home Depot, U.S.A., Inc.</u>, No. 14-CV-260-JD, 2014 WL 6750648, at *2 n.4 (D.N.H. Dec. 1, 2014). So, "[a]lthough federal case law is not controlling, it is instructive when interpreting similar statutory provisions and issues that the New Hampshire Supreme Court has not yet decided." <u>Carney</u>, 2017 WL 680384, at *6.

"[A] plaintiff generally may not maintain a suit against a defendant in federal court if that defendant was not named in the administrative proceedings and offered an opportunity for conciliation or voluntary compliance." <u>McKinnon v. Kwong Wah Restaurant</u>, 83 F.3d 498, 504 (1st Cir. 1996) (citing 42 U.S.C. § 2000e-5(f) ("civil action may be brought against the respondent named in the charge")). "However, this general rule is not absolute." <u>Burnett v. Ocean Properties Ltd</u>., No. 2:16-CV-00359-JAW, 2017 WL 1331134, at *7 (D. Me. Apr. 11, 2017) (citing <u>McKinnon</u>, 83 F.3d at 505). "For instance, under the 'identity of interests' exception, a party may file suit against a defendant who was not originally named in the administrative filing if there is a clear identity of interest between the named and unnamed defendants." <u>Id</u>. (citations omitted).

<u>Burnett v. Ocean Properties Ltd</u>., 2017 WL 1331134, is instructive and persuasive. There, defendants argued that the

court should dismiss plaintiffs' Title VII and state law claims against a defendant who had not been named in the plaintiff's EEOC charge filed with the Maine Human Rights Commission.  Id. at *7.  The court noted that, in McKinnon, 83 F.3d at 505, the First Circuit cited Glus v. G.C. Murphy Co., 562 F.2d 880 (3rd Cir. 1977), "in which the Third Circuit announced a four-factor test to determine whether an identity of interest exists between a named and unnamed defendant."  2017 WL 1331134, at *7.  Those factors include:

> 1) whether the role of the unnamed party could through reasonable effort by the complainant be ascertained at the time of the filing of the EEOC complaint; 2) whether, under the circumstances, the interests of the named are so similar as the unnamed party's that for purposes of obtaining voluntary conciliation and compliance it would be unnecessary to include the unnamed in the EEOC proceedings; 3) whether its absence from the EEOC proceedings resulted in actual prejudice to the interests of the unnamed party; 4) whether the unnamed party has in some way represented to the complainant that its relationship with the complainant is to be through the named party.

Burnett, 2017 WL 1331134, at *7–8 (quoting Glus, 562 F.2d at 888).  Noting that the Glus inquiry is a "fact-intensive" one, and that defendants had not squarely addressed the "identity of interests" exception in their briefing, the court determined that a more fully developed factual record was necessary to determine whether the "identity of interest" exception applied in that case.  Id. at 8.

So too, here.  Neither Drake nor the Town Defendants squarely mention the "identity of interest" exception in their briefing, much less provide the requisite factual support for their arguments.  As in Burnett, a more fully developed factual record is necessary for the court to determine whether the "identity of interest" exception might apply.  Accordingly, the court declines, at this stage, to dismiss Drake's RSA 354-A claim against the Selectmen and Brace for failure to exhaust administrative remedies.

   2.   Failure to State a Claim

The Town Defendants further argue that Drake's RSA 354-A claim against the Selectmen should be dismissed because she fails to allege facts that implicate those defendants in the purported harassment and retaliation.  That argument is similarly unpersuasive.  While Drake's allegations in support of her claims against the Selectmen are unarguably meagre, they are, at this stage of the litigation, sufficient to withstand the Town Defendants' motion to dismiss.

**Count XI – 42 U.S.C. § 2000e-2 – Unlawful Gender Discrimination, Retaliation, Aiding & Abetting (All Defendants)**

Drake concedes that her Title VII claim can only proceed against the Town, and she agrees to dismissal against all other defendants.  See Obj. to Mot. to Dismiss at p. 21.

**Count XII – RSA 98-E – Employee Freedom of Expression Law (Town)**

Drake alleges that she reported her concerns regarding purported "illegal and unethical activities" to her supervisors, the Town Board of Selectmen, and the Manchester Police Department.  She says that by reporting that conduct, she was furthering public policies and invoking her freedom of expression.  Drake alleges that the Town's behavior constitutes interference with her right to free speech, and to criticize and/or disclose information, in violation of NH RSA 98:E-1.

New Hampshire RSA 98:E-1 provides that "a person employed as a public employee in any capacity shall have a full right to publicly discuss and give opinions as an individual on all matters concerning any government entity and its policies." N.H. Rev. Stat. Ann. § 98-E:1.  "The chapter prohibits a person from 'interfer[ing] in any way with the right of freedom of speech, full criticism, or disclosure by any public employee.'" Bellerose v. SAU No. 39, No. 13-CV-404-PB, 2014 WL 7384105, at *8 (D.N.H. Dec. 29, 2014) (quoting N.H. Rev. Stat. Ann. § 98–E:2).

The parties dispute whether Drake's conduct is covered by the statute.  The Town Defendants argue that Drake does not sufficiently allege that she was speaking as "an individual,"

nor does she allege that she publically discussed her concerns. Drake disagrees.

Unfortunately, neither parties' briefing addresses these issues sufficiently to allow the court to resolve the controlling question of law. Given the scarcity of state precedent interpreting RSA 98:E-1 and the absence of developed arguments, the court declines to wade into (likely novel) issues of controlling state law without the benefit of adequate briefing. Accordingly, the court denies the Town Defendants' motion to dismiss the claim. The Town Defendants are, of course, free to raise the issue at the summary judgment stage, supported by a fully developed record and briefing.

### Count XIII – Intentional Interference with Prospective Contractual Relations (Brace, Masella, Fisher and Town)[8]

The Town Defendants have also moved to dismiss Drake's intentional interference with contractual relations claim against them. In support of her claim, Drake alleges that defendants "purposely caused" the City of Manchester from entering into an employment agreement with her. The Town

---

[8]    Drake has erroneously numbered her claims in the complaint, labeling this claim as a second "Count XII."

Defendants argue that Drake's claim against the Town is barred by the workers' compensation law. Drake disagrees.

The New Hampshire Supreme Court has held that for an injury to be subject to the state's workers' compensation law, the party seeking such coverage must prove:

> (1) that the injury arose out of employment by demonstrating that it resulted from a risk created by the employment; and (2) that the injury arose in the course of employment by demonstrating that (A) it occurred within the boundaries of time and space created by the terms of employment; and (B) that it occurred in the performance of an activity related to employment, which may include a personal activity if reasonably expected and not forbidden, or an activity of mutual benefit to employer and employee.

Murphy v. Town of Atkinson, 128 N.H. 641, 645–46 (1986) (emphasis supplied) (citations omitted). Given that standard, the court finds the Town Defendants' argument unpersuasive: Drake's alleged injury (the loss of her employment opportunity with the Manchester Police Department) did not occur "within the boundaries of time and space" of her employment with the New Boston Police Department, or in her performance of an activity related to her employment with the New Boston Police Department.

The Town Defendants further argue that Drake has not sufficiently alleged causation. They point out that Drake fails to even allege contact between the relevant parties, or the requisite intent. Again, the argument is unpersuasive. Drake

alleges that she was "all but assured employment" by the Manchester Police Department, and, _inter alia_, that Brace, Masella and Fisher "caused [the Manchester Police Department] to believe that Drake lacked credibility and would be [placed] on the "Laurie List."[9] Compl. ¶ 113-114. Drake further alleges that defendants' conduct was purposeful. Compl. ¶ 230. The Town Defendants' remaining arguments are similarly unpersuasive. While inarguably weak, Drake's factual allegations are sufficient to withstand the Town Defendants' motion to dismiss.

### Count IX – Violation of RSA 41:48 (Town)

Finally, the Town Defendants have moved to dismiss Drake's claim for violation of RSA 41:48. Drake agrees to dismissal of the claim. _See_ Obj. to Mot. to Dismiss at p. 25.

### CONCLUSION

For the foregoing reasons, as well as those set forth in the Town Defendants' memoranda (documents no. 8-1 and 16), the Town Defendants' motion to dismiss (document no. 8) is **GRANTED**

---

[9] In her Objection to the Town Defendants' Motion to Dismiss, Drake argues that, once she informed her superiors that she would likely be hired by the Manchester Police Department, "Brace took it upon himself to call the Manchester Police Department," and that, after Drake's meeting with the Chief of the MPD was cancelled, she "was told the reason was Chief Brace." Obj. to Mot. to Dismiss at p. 24. Those factual allegations, however, are absent from Drake's complaint and so are not relevant.

in part and **DENIED** in part, as set forth herein.  Drake has also stipulated to dismissal of several claims she advanced against Fisher and Masella.  <u>See</u> document no. 18.  Therefore, the following claims are dismissed:

Count I, Drakes' Civil Conspiracy claim, is dismissed against Brace.

Count II, Drake's "Defamation Per Se and Ordinary Defamation" claims, is dismissed against all defendants.

Count IV, Drake's Intentional Infliction of Emotional Distress claim, is dismissed against the Town Defendants.

Count V, Drake's Negligent Infliction of Emotional Distress claim, is dismissed against all defendants.

Count VII, Drake's Section 1983 claim for violations of procedural due process, substantive due process and the First Amendment, is dismissed against the Town Defendants.

Count VIII, Drake's Section 1983 claim for conspiracy to violate her civil rights, is dismissed against the Town Defendants.

Count XI, Drake's Title VII claim is dismissed against all defendants except for the Town of New Bedford.

Count XIV, Drake's claim for violation of RSA 41:48, is dismissed against the Town of New Boston.


**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

June 6, 2017

cc:  Tony F. Soltani, Esq.
     Donald L. Smith, Esq.
     Brian J. S. Cullen, Esq.
     Samantha D. Elliott, Esq.